*IN THE UNITED STATES DISTRICT COURT FOR THE*
*WESTERN DISTRICT OF MICHIGAN*

*_____*

***SOUTHERN DIVISION***
_____

**MIMI'S SWEET SHOP, INC. ®,**

*Plaintiffs,*

VS.

**CHARTER TOWNSHIP OF LANSING DOWNTOWN DEVELOPMENT
AUTHORITY,
STEVEN M. HAYWARD,
MICHAEL G. EYDE,
EASTWOOD, LLC,
TOWNEAST, LLC,
TOWNEAST PARKING LLC,**

*Defendants.*

*Docket No.*
*Hon.*
*Filing Date:*

_____/

*PERRONE LAW, P.C.*
Jacob A. Perrone (Mich Bar No. 71915)
*Attorney for Plaintiff*
221 W. Lake Lansing Rd. Ste. 200
East Lansing, MI 48823
(517) 351-0332

_____

# **EXHIBIT A**

## First Amended Complaint

Perrone Law, P.C. § 221 West Lake Lansing Road, Suite 200, East Lansing, Michigan 48823 § Phone: 517.351.0332 § Fax. 517.913.6287 § jacob@perronelawpc.com



# LEASE AGREEMENT

**FOR:**

*For*

# Mimi's Sweet Shop. Inc.®

TBD Showtime Drive, Lansing, MI 48912

**AT:**

## The Heights of Eastwood

# Retail Lease

T

THIS LEASE has been made and entered into as of July 28th, 2015 by and between the Lansing Township Downtown Development Authority, a Michigan downtown development authority, organized and operating under the Downtown Development Authority Act, MCL 125.1651, et seq., whose address is 3209 West Michigan Avenue, Lansing, Michigan 48917 ("Landlord"), and Mimi's Sweet Shop, Inc.®, a Michigan Corporation, whose address is 2420 Lyman Drive, Lansing, MI 48912 ("Tenant").  The effective date ("Effective Date") of this Lease will be the date of full execution by both Landlord and Tenant.

## WITNESSETH:

In consideration of the mutual undertakings herein contained, and intending to be legally bound, Landlord and Tenant agree as follows:

## ARTICLE 1

### Definitions

1.1 *Definitions*. When used in this Lease, the following defined terms shall carry the definitions, which follow them, unless the context clearly indicates to the contrary:

(a) "Common Areas" means all portions of the Project (but not any portion of the Structure) available for common use and not intended to be leased, such as parking areas and sidewalks, as well as any rights of ingress and egress to the Project and any derivative rights (as more fully described below) the Project (collectively) has to enjoy the Common Areas and/or Common Facilities of the larger shopping center ("Shopping Center") of which the Project is a part, as the Shopping Center is defined in the Declaration of Easements, Conditions and Restrictions ("ECR") dated October 31, 2001 and recorded with the Ingham County Register of Deeds on November 8, 2001, at Liber 2925 Page 978.

(b) "Lease Year" means each consecutive 12-month period from and after the Rent Commencement Date until expiration of this Lease.

(c) "Operating Costs" means the aggregate of all direct and indirect commercially reasonable costs of owning, operating, managing, administering, promoting, maintaining, repairing, replacing, insuring, and improving the Project (including the Project's pro rata share of the costs  recoverable from the Project by the Shopping Center as defined and established in the ECR, particularly, but not limited to Section 6.b. of the ECR), including, but not limited to, snow removal, landscaping, common area maintenance and utility usage, association fees, costs of the utility room, applicable condominium expenses, if any, parking expenses, if any, and any and all the reasonable and customary "triple net" charges, except the following costs of the Project: (1) Landlord's repair obligations pursuant to Section 7.2 below;  (2) The Project's pro rata share of the costs recoverable from the Project by the Shopping Center as defined and established in the ECR will not exceed 3% of the Tenants base rent; (3) Additional Exclusions from Operating Costs and expenses are the following:

(i) The cost of the original construction of the Premises, the building in which the Premises are located ("Building"), the Structure and the Project as they exist on the date hereof, or any additions or expansions to the Common Areas, Structure or the Project and other items which under generally accepted accounting principles are properly classified as capital expenditures of any kind; (ii) any repairs or work performed to any portion of the Project intended to be occupied by individual tenants,

and the cost of correcting any defects in the original construction of the Premises, the Building, Structure or Project; (iii) any reserves for future expenditures not yet incurred excluding reasonable reserves for maintenance; (iv) ground lease rental; (v) costs incurred by Landlord for repair or restoration to the extent that Landlord is reimbursed by insurance or condemnation proceeds or that the same is covered by warranty or Landlord's insurance deductibles; (vi) costs, including permit, license and inspection costs incurred with respect to the installation of improvements made for tenants or other occupants or incurred in renovating or otherwise improving, decorating, painting or redecorating vacant space for tenants or other occupants; (vii) attorneys' fees, leasing commissions and other costs and expenses incurred in connection with negotiations or disputes with present or prospective tenants or other occupants of, or persons, firms or entities with respect to, the Project; (viii) expenses in connection with services or benefits which are not offered to Tenant; (ix) costs incurred by Landlord due to the negligence or misconduct of Landlord or its agents, contractors, licensees and employees or the violation by Landlord or any tenants or other occupants of the terms and conditions of another lease of space or other agreements including this Lease; (x) overhead and profit increment paid to Landlord or to subsidiaries or affiliates of Landlord for services to the extent the same exceeds the costs of such services rendered by other first-class unaffiliated third parties on a competitive basis; (xi) interest, principal points and fees on debts or amortization on any mortgage or mortgages or any other debt instrument encumbering all or any portion of the Project or the real property upon which the Building and Project is located; (xii) any compensation paid to clerks, attendants or other persons in commercial concessions operated by Landlord; (xiii) all items and services for which Tenant or any other tenant reimburses Landlord or which Landlord provides exclusively to one or more tenants (other than Tenant) but not all tenants without reimbursement; (xiv) advertising and promotional expenditures (not to exceed $760 annually); (xv) electric power costs for which any tenant or occupant directly contracts with the local public service company; (xvi) any costs relating to hazardous materials, asbestos and the like not resulting from actions of Tenant; (xvii) charitable contributions; (xviii) off-site traffic signs or signals (except those for which the Project must reimburse the Shopping Center); (ixx) any charges for depreciation of the Project, or equipment; (xx) any charge for Landlord's income taxes, excess profit taxes, or·franchise taxes; (xxi) any amount in excess of Ten (10%) Percent of the total of all of the Landlord's Operating costs and expenses charged to cover Landlord's administrative costs. In any event there shall be no duplication in charges to Tenant by reason of the provision in this Lease setting forth Tenant's obligation to reimburse Landlord for common area expenses and any other provision herein.

(d) "Premises" means that space in the Project shown outlined on **Exhibit A** attached hereto-totaling approximately 3,000 square feet of interior space, approximately 166 square feet of "bonus" storage/office area, plus exterior patio seating not to exceed 400 square feet total along the east and south side of the Property.

(e) "Project" means the Property and all improvements and installations located or to be located thereon under the control or joint control of Landlord, as the same may be modified, altered, expanded or reduced from time to time, and commonly known as the Heights at Eastwood.

(f) "Property" means the real estate described on **Exhibit B** hereto.

(g) "Rent" means Base Rent and all other charges which shall be deemed payable by Tenant in consideration of the demise of the Premises.

(h) "Structure" means the mixed-use parking structure containing approximately 44,000 square feet of commercial use on its ground floor.

(i) "Taxes" means all real estate taxes and assessments (general or special) of every kind and nature and other or similar charges levied or billed by any governmental unit during the Term in respect of the Project or the Premises, or both, or any part thereof; provided, however, that in the case of special assessments payable in installments, only current installments shall be included in the definition of Taxes for any one calendar year. Taxes shall also include any governmental charge levied in lieu of all or any part of the

foregoing, as well as any Sales Tax arising out of this Lease (including any operational expenses) and/or its Base Rent and/or Additional Rent. A majority of tenants at the Project may, at their sole cost and expense, contest Taxes with the assessing governmental authority.

(j) "Tenant's Pro Rata Share" means a fraction, the numerator of which shall be the gross leasable ground floor area of the Premises (excluding the patio area) and the denominator of which shall be the gross floor area of the leasable square footage (not including parking areas) controlled by the Landlord in the Project.

1.2 *Gender; Singular and Plural.* Whenever in this Lease words, including pronouns, are used in the masculine, they shall be read in the feminine or neuter whenever they would so apply and vice versa, and words in this Lease that are singular shall be read as plural whenever the latter would so apply and vice versa.

## ARTICLE 2

### Demise of Premises; Possession

2.1 *Demise of Premises; Term.*

(a) Landlord leases the Premises to Tenant, and Tenant hires the Premises from Landlord, on the terms and subject to the conditions contained herein, for a term of ten (10) Years, beginning on the Effective Date, unless sooner terminated as provided herein (the "Term"). Tenant shall have the option of extending this Lease ("Renewal Option") for two (2) additional five (5) year Terms, under the same terms and conditions herein, provided Tenant is not currently in material breach of this Lease at the time of the exercise of the Renewal Option beyond any applicable cure period (each such period being referred to in this Lease as a "Renewal Term"). Each Renewal Option shall automatically be exercised without written notice to Landlord, except that Tenant shall have the right to terminate this Lease and any Renewal Option by providing written notice not less than ninety (90) days prior to the expiration date of the initial Term.

If Tenant does not reach Percentage Rent and pays Base Rent Only in all of the first three (3) years, then the Tenant in its sole discretion has the right to terminate the lease at the end of the third (3rd) year, upon sixty (60) days written notice, given not sooner than the date upon which Tenant provides Landlord required Statement of Gross Sales (defined below) for the third (3rd) Lease year (and, further provided that Landlord be entitled to its audit rights for same, before such termination is effective).

2.2 *Use of Premises.*

(a) Tenant shall use and occupy the Premises for the purpose of operating an ice cream and confectionary shop along with incidental uses ("Tenant's Use"), substantially as set forth on the menu attached to this Lease as **Exhibit F**. Landlord further agrees that Tenant may add, delete and/or change its menu without the prior consent of the Landlord provided that Tenant complies with all local codes and ordinances, that such change does not materially change the character of the business as an "ice cream and confectionary shop," and that the Landlord has no existing agreements (at the time of the menu change) prohibiting such menu additions. Tenant may, but shall not be required to remain open seven (7) days per week. On days that the Tenant is open they must remain so for a minimum of 6 hours per open day. Landlord acknowledges that that the normal operation of Tenant's business will create certain cooking aromas; Tenant warrants and agrees that such cooking aromas will not unreasonably interfere with the quite enjoyment of the the Landlord, other lessees of Landlord and/or other adjacent land holders.

Landlord grants the Tenant the exclusive principal use of serving ice cream and confectionary products ("Limited Exclusive Use"), although incidental sales by other businesses is acceptable. Therefore, no other

future Tenant within the Heights at Eastwood can exceed 5% of their gross sales by serving substantially similar ice cream and confections.

Further, Landlord shall indemnify and hold the Tenant harmless from any third party claim or suit regarding the Limited Exclusive Use granted by Landlord. Landlord agrees to provide the Tenant with all current and future exclusivity agreements with other lessees of Landlord. As of the execution date of this Lease, the exclusivity agreements with other lessees consist of:

1. Tony Sacco's Coal Oven Pizza. Landlord shall not lease, sell, or allow any property to be used within the Project that is under its ownership for operating another pizza restaurant or any other business that generates more than five percent (5%) of its Gross Top Line Sales from any combination of pizza, calzones, or mezzaluna sandwiches.

2. Capital Prime Steak and Seafood: Landlord grants [T]enant an exclusive for [T]enant's Use and agrees that Landlord shall not lease, sell, or allow any property to be used within the Project that is under its ownership for operating another upscale steak and seafood restaurant that generates more than ten percent (10%) of its Gross Sales from any combination of steak or seafood. This exclusive does not include regional ethnic cuisine such as sushi, sashimi, Japanese hibachi, paella, Cajun, etc. Specific brands, and those similar to the following are specifically included within the exclusion: Longhorn Steakhouse, Outback, Bonefish, Morton's, Ruth's Chris Steakhouse, Flemings, Capital Grill, Ocean Prime, Chesapeake Crab, London Chop House, Logan's, Knight Cap, Troppo's.

3. Chapelure. Landlord grants the Tenant the exclusive principle use of serving fine baked goods & fine desserts as identified on Exhibit E "Menu" (of the Chapelure Lease) (excluding the categories labeled Sandwiches, Breads and Chocolates), expresso based drinks and fine teas, although incidental sales by other businesses is acceptable ("Exclusive Items"). Therefore, no other Tenant within the Heights at Eastwood can exceed 5% of their gross sales by serving Exclusive Items.

(Collectively, "Current Landlord Exclusives").

Notwithstanding any other provision of this Lease, or any other agreements, Tenant acknowledges that in addition to the Current Landlord Exclusives, the Leased Premises, Project and Shopping Center are subject to the ECR; Tenant also acknowledges that prior lessees of the Shopping Center and Project (including, but not limited to those possessing the Current Landlord Exclusives) have existing exclusive use and/or other property rights (collectively, "Alternate Lessee's Rights"). Tenant accepts the Leased Premises and Common Areas subject to all restrictions imposed and rights granted under the ECR and Alternate Lessee's Rights (collectively, "Tenant's Restrictions") and to assume compliance with same on the Leased Premises and on the Common Areas at all times. Tenant agrees to refrain from any acts of omissions, which would violate the Tenant's Restrictions and agree to indemnify, hold harmless and defend Landlord against any claims, damages, suits or liability (including reasonable attorney fees and costs) of any kind arising out of Tenant's acts or omissions in this regard.

(b) Tenant shall not use the Premises, or permit the Premises to be used, in a manner that constitutes a violation of applicable law, order, ordinance, or regulation or that may be dangerous; nor shall Tenant commit any waste in the Premises, or permit anything to be done on the Premises intending to create a nuisance, to disturb others, or to injure the reputation of the Project. Tenant's right to sell alcoholic beverages shall be conditioned upon and subject to all of the following terms and conditions: (i) Tenant shall obtain, continuously maintain and comply with, at Tenant's sole cost and expense, (a) any and all necessary permits, licenses and/or governmental or quasi-governmental approvals required for the sale of alcohol (copies of which permits, licenses and/or approvals shall be provided to Landlord and will be posted in the Premises at all times if required by applicable laws), and (b) the insurance required under this Lease, (ii) the sale of alcohol shall be for on-Premises consumption only, and (iii) Tenant's right to sell alcohol shall be limited to sales made in connection with the operation of the permitted restaurant from the Premises (i.e., in no event shall the Premises be used as a tavern or cocktail lounge or primarily for the sale of alcoholic

beverages. In connection with the aforementioned restriction prohibiting the operation of the Premises as a tavern or cocktail lounge, Tenant shall not be deemed to be operating a "tavern" or "cocktail lounge" only for so long as it is not emphasizing the service of alcoholic beverages for consumption on the Premises) and, further, as limited by the ECR. Notwithstanding the foregoing, in no event shall Tenant use or permit the use of the Premises for any purpose which would breach any covenant of or affecting Landlord concerning radius, location, use or exclusivity in any other lease, financing agreement or other agreement relating to the Project or the Shopping Center (including, but not limited to, the ECR).

The Parties agree that violation of this section would cause irreparable harm for which there would be no remedy at law, and that injunctive relief would be necessary and appropriate to prevent violation of same.

2.3 *Possession.*

(a) Landlord will deliver Premises to Tenant within 60 days of receiving the building permit for the Tenants building plans (the "Possession Date"). Tenant shall for purposes of this Lease will not have been deemed to have taken possession of the Premises for purposes of paying Rent, if it occupies them for the purposes of commencing or planning improvements or if it or any contractor hired by it commences any work therein. However, upon such taking of possession, Tenant shall have in place all required insurance and shall be liable for any costs it incurs (including liability for any construction lien which may be placed on the Premises or the Project of which it is a part).

(b) Tenant's obligation to pay Rent shall commence on the earlier of opening for business or 120 days after the Landlord has delivered the Premises to Tenant ("Rent Commencement Date") which is due per Section 3.1(c) and no liability, by abatement of Rent or otherwise, shall arise against Landlord as a result of delays in occupancy caused by decoration or any other work on the Premises done by or at the request of Tenant.

2.4 *Condition of Premises; Representations.* Except as Landlord and Tenant may otherwise agree in writing, Tenant's entry into possession shall constitute conclusive evidence against Tenant that it has inspected the Premises and found them to be in good order and satisfactory condition at the time of entry and that Tenant has accepted the Premises in their then "as is" condition, provided all of Landlord's Work has been completed in its entirety. Except as expressly set forth herein, neither Landlord nor Landlord's agents have made any representations or promises with respect to the physical condition of the Premises or any other portion of the Project, Operating Costs or any other matter pertaining to the Project or the Premises.

2.5 *Quiet Enjoyment.* Landlord covenants and agrees with Tenant that upon Tenant's paying the Rent and observing and performing all the terms, covenants and conditions to be performed and observed, Tenant may peaceably and quietly enjoy the Premises hereby leased, subject, however, to any mortgages now existing or hereafter granted by Landlord.

2.6 *Condominium Matters.* Tenant understands and acknowledges that the Premises and Building are part of a larger condominium ("Condominium") known as the Heights at Eastwood, with a Master Deed ("Master Deed") dated November 7, 2012, and recorded on November 28, 2012 as Instrument No. 2012-049694, Ingham County Records, designated as Ingham County Condominium Subdivision Plan No. 275, as amended by a First Amendment to the Master Deed of The Heights at Eastwood Condominium, dated May 13, 2013, and recorded on May 16, 2013 as Instrument No. 2013-025481, Ingham County Records. Additionally, at some point in time, Landlord may sub-condominiumize the Building ("Sub-comdominium"), and Tenant agrees that Landlord may do so without approval of Tenant, so long as such action does not increase the costs to Tenant or diminish rights of the Tenant. Tenant agrees: (a) to comply with all requirements and limitations for the Condominium and Sub-condominium, if any (including, but not limited to those contained in the Master Deed (and sub-master deed for the Sub-condominium, if any) by-laws, resolutions, propounded rules and other documents related to the Condominium and/or Sub-condominium (collectively, "Governing Condominium Documents"), and (b) that it waives all rights under the Governing Condominium Documents

and agrees that all such rights remain vested in the Landlord or the entities through which Landlord claims. Additionally, Tenant agrees to abide by and honor such reasonable rules and regulations related to parking as may be propounded by Landlord and/or under the Master Deed by the operator of any parking at the Project. Tenant acknowledges that it has read, understands and agrees: (a) to the Master Deed as it applies to parking and the rights and restrictions of the operator of the parking at the Project to charge for same, and (b) the Master Deed and other documents governing the project establishing that some parking at the Project is Common Area and that some parking at the Project may be part of a Condominium unit, which may be restricted or governed by the Master Deed and/or the unit's owner(s) and/or lessor(s). Tenant agrees to abide by and respect the restrictions, charges and rules that may be placed on parking, units or rights owned and/or leased by third parties, and to any reasonable rules and regulations that Landlord may implement to protect other entities or units at the Project from unreasonable interference with same.

## ARTICLE 3

### Rent and Other Charges

Rent as defined above, shall include, but not be limited to, Base Rent, Additional Rent (as due), Percentage Rent (as due), Operating Expenses (including, but not limited to Taxes, Insurance, Utilities and other matters due as same), Late Charges, Interest on Rent, any other interest and any and all other charges due or which may come due under the terms of the Lease, as more fully set forth in this Article 3, and elsewhere in the Lease.

3.1 *Base Rent, Additional Rent, Percentage Rent, Gross Sales, Promotional Items and Related Matters.*

(a) Tenant shall pay Landlord base rent ("Base Rent") as follows:

Twenty 00/100 Dollars ($20.00 PSF) per rentable square foot of 3,000 square feet of interior space (subject to actual measurement after improvements) per year for Lease Year One (1) (the "Base Rent."). Base Rent will not be payable on the patio area. The Base Rent shall be payable in twelve (12) equal monthly installments each month for Lease Year One, commencing on the Rent Commencement Date. The Base Rent shall be adjusted annually, as provided in Section 3.1(d) below, and following adjustment, Tenant shall pay the adjusted Base Rent in a like manner.

(b) Each monthly installment of Base Rent shall be payable in advance on or before the 1st day of each calendar month during the Term at such place as the Landlord shall from time to time designate. By way of example, only, Base Rent for February 2016, would be due February 1st, 2016. If this Lease commences other than on the first day of a calendar month, monthly installments of Base Rent for the first and last months of the Term shall be prorated.

(c) Tenant shall also pay as additional rent ("Additional Rent"), the amount computed by the following methodology:

The Base Rent paid or to be paid, shall be subtracted from the amount of percentage rent that would be due using a percent of Tenant's "Gross Sales" (as defined below) over the Break Point using the table found under Section 3.1 (h) ("Percentage Rent"). The "Break Point" shall be defined as the Tenant's first Eight Hundred Thousand dollars ($800,000) of Gross Sales collected in a Lease Year.

If Tenant's gross sales are at or below the Break Point, then only Base Rent is due. Tenant shall pay Base Rent monthly in advance as set-forth in Section 3.1(b). Additional Rent is payable in arrears, as it is based on

the previous month's actual sales that have been annualized.  This Additional Rent shall be calculated and due as follows:

> Each installment of Additional Rent for a month shall be payable in arrears on a monthly basis during the following natural calendar month, using Exhibit "G." Each installment of Additional Rent shall be payable with the Base Rent on or before the Fifteenth (15th) day after the close of each calendar month during the Lease Year in question.  (By example, only, the Additional Rent for January 2016, would be due on February 15, 2016).  (By way of clarification, Percentage Rent for the last month of the Lease will be due by the 15th of the following month, even though not Base Rent is due).  Such monthly installment of Additional Rent shall be based on the Tenant's sales of the immediate preceding month, and payment shall be remitted to such place as the Landlord shall from time to time designate. If this Lease commences other than on the first day of a calendar month, monthly installments of Additional Rent for the first and last months of the Term shall be prorated. Using Exhibit "G" Tenant shall report its monthly Gross Sales to Landlord on or before the fifteenth (15th) day after the close of each calendar month during the Term.  Using Exhibit "H" Tenant shall report its annual Gross Sales to Landlord on or before the fifteenth (15th) day after the close of the calendar year.  Any additional amount owed to the Landlord from the previous monthly estimates using Exhibit "G" will be included with the form, while any credits to the Tenant will be deducted from the twelfth (12th) month's payment.

"Gross Sales" of Tenant is defined as the gross selling price of all food, merchandise and beverages/or services sold upon or from the Premises by Tenant, its permitted subtenants, licensees and concessionaires, whether for cash or on credit, whether collected or not, whether made by telephone, mail, the internet or otherwise not directly in person on the Premises and whether made by store personnel. The term "Gross Sales" shall not include any sales or similar taxes, tips or gratuities given by customers to Tenant's employees, gift card sales (although redemptions of gift cards at the Premises shall be included), the cost of meals provided to Tenant's employees without charge (or if discounted, the amount of the discount), complimentary or promotional food dispensed or spills, and any amounts retained by a credit card processing company fee paid by Tenant for Tenant to provide its customers the ability to use said credit card for purchases at the Premises.  All sales originating at the Premises shall be considered as made and completed from the Premises, even though bookkeeping and payment of the account may be transferred to another place for collection and even though actual filling of the sale or service order and actual delivery of the merchandise may be made from a place other than the Premises. Each installment sale or sale upon credit, including "lay away" sales, shall be treated as a sale for the full cash price at the time of sale.

Notwithstanding anything to the contrary, Gross Sales shall not include any sales or revenue related to the development, franchising, or real estate of Tenant's business, including, but not limited to franchise fees, royalties, interest, or real estate fees collected by Tenant, Tenant's affiliates, Tenant's franchisor, or Tenant's area developer or catering sales or sales for off premises consumption unless it is greater than 2.5% of the Annual Gross Sales.

(d) Upon the first annual anniversary of the commencement of the Term, and upon each annual anniversary thereafter, the Base Rent and Percentage Rent Table gross top line sales dollar amounts shall be adjusted by multiplying the Base Rent and Percentage Rent table gross top line sales dollar amounts, in effect for the previous Lease year times 1.02 (being a two percent (2%) and adding that product to the Base Rent and Percentage Rent Table gross top line sales dollar amounts of the previous Lease year. Further, the break point in the tables shall be adjusted upward annually by two percent (2%) using the same methodology.

future Tenant within the Heights at Eastwood can exceed 5% of their gross sales by serving substantially similar ice cream and confections.

Further, Landlord shall indemnify and hold the Tenant harmless from any third party claim or suit regarding the Limited Exclusive Use granted by Landlord. Landlord agrees to provide the Tenant with all current and future exclusivity agreements with other lessees of Landlord. As of the execution date of this Lease, the exclusivity agreements with other lessees consist of:

    1. Tony Sacco's Coal Oven Pizza: Landlord shall not lease, sell, or allow any property to be used within the Project that is under its ownership for operating another pizza restaurant or any other business that generates more than five percent (5%) of its Gross Top Line Sales from any combination of pizza, calzones, or mezzaluna sandwiches.

    2. Capital Prime Steak and Seafood: Landlord grants [T]enant an exclusive for [T]enant's Use and agrees that Landlord shall not lease, sell, or allow any property to be used within the Project that is under its ownership for operating another upscale steak and seafood restaurant that generates more than ten percent (10%) of its Gross Sales from any combination of steak or seafood. This exclusive does not include regional ethnic cuisine such as sushi, sashimi, Japanese hibachi, paella, Cajun, etc. Specific brands, and those similar to the following are specifically included within the exclusion: Longhorn Steakhouse, Outback, Bonefish, Morton's, Ruth's Chris Steakhouse, Flemings, Capital Grill, Ocean Prime, Chesapeake Crab, London Chop House, Logan's, Knight Cap, Troppo's.

    3. Chapelure. Landlord grants the Tenant the exclusive principle use of serving fine baked goods & fine desserts as identified on Exhibit E "Menu" (of the Chapelure Lease) (excluding the categories labeled Sandwiches, Breads and Chocolates), expresso based drinks and fine teas, although incidental sales by other businesses is acceptable ("Exclusive Items"). Therefore, no other Tenant within the Heights at Eastwood can exceed 5% of their gross sales by serving Exclusive Items.

(Collectively, "Current Landlord Exclusives").

Notwithstanding any other provision of this Lease, or any other agreements, Tenant acknowledges that in addition to the Current Landlord Exclusives, the Leased Premises, Project and Shopping Center are subject to the ECR; Tenant also acknowledges that prior lessees of the Shopping Center and Project (including, but not limited to those possessing the Current Landlord Exclusives) have existing exclusive use and/or other property rights (collectively, "Alternate Lessee's Rights"). Tenant accepts the Leased Premises and Common Areas subject to all restrictions imposed and rights granted under the ECR and Alternate Lessee's Rights (collectively, "Tenant's Restrictions") and to assume compliance with same on the Leased Premises and on the Common Areas at all times. Tenant agrees to refrain from any acts of omissions, which would violate the Tenant's Restrictions and agree to indemnify, hold harmless and defend Landlord against any claims, damages, suits or liability (including reasonable attorney fees and costs) of any kind arising out of Tenant's acts or omissions in this regard.

    (b) Tenant shall not use the Premises, or permit the Premises to be used, in a manner that constitutes a violation of applicable law, order, ordinance, or regulation or that may be dangerous; nor shall Tenant commit any waste in the Premises, or permit anything to be done on the Premises intending to create a nuisance, to disturb others, or to injure the reputation of the Project. Tenant's right to sell alcoholic beverages shall be conditioned upon and subject to all of the following terms and conditions: (i) Tenant shall obtain, continuously maintain and comply with, at Tenant's sole cost and expense, (a) any and all necessary permits, licenses and/or governmental or quasi-governmental approvals required for the sale of alcohol (copies of which permits, licenses and/or approvals shall be provided to Landlord and will be posted in the Premises at all times if required by applicable laws), and (b) the insurance required under this Lease, (ii) the sale of alcohol shall be for on-Premises consumption only, and (iii) Tenant's right to sell alcohol shall be limited to sales made in connection with the operation of the permitted restaurant from the Premises (i.e., in no event shall the Premises be used as a tavern or cocktail lounge or primarily for the sale of alcoholic

(e) If at the beginning of any Lease Year adjusted Base Rent shall not have been calculated, Tenant shall continue paying the Base Rent previously in effect on a timely basis. Upon notification by Landlord of the adjusted Base Rent, Tenant shall immediately pay Landlord the difference between Base Rent paid and that which would have been due had adjusted Base Rent been calculated and shall thereafter continue paying equal monthly installments of adjusted base Rent.

(f) *Statement of Gross Sales.* Tenant agrees to furnish or cause to be furnished to Landlord a statement of Tenant's monthly Gross Sales using Exhibit "G" on a monthly basis and Exhibit "H" Annually. Such statements shall be certified as accurate accountings of Tenant's Gross Sales from the Premises by the chief officer of Tenant. Tenant shall record at the time of each sale transaction in the presence of the customer, all receipts from sales or other transactions, whether for cash or credit, in a cash register, or in cash registers, having a cumulative total and which shall number consecutive purchases. Tenant shall keep full and accurate books of account, records, and all such cash register receipts concerning Gross Sales and net sales, credits, refunds and other transactions made from or upon the Premises (including the Gross Sales and net sales of any permitted subtenant, licensee or concessionaire). Such books, receipts and records shall be kept for a period of not less than three (3) years after the close of each calendar year and shall be available for inspection and audit by Landlord or its representatives at all times during regular business hours following reasonable advance notice. In addition, upon request of Landlord, Tenant agrees to furnish to Landlord a copy of Tenant's sales tax return. The receipt by Landlord of any statement or any payment of Additional Rent for any period shall not be binding upon Landlord as to the accuracy of such statement or payment. At any time within three (3) years of receipt of any such statement following reasonable advance notice, Landlord shall be entitled to an independent audit of such Gross Sales and net sales, to be conducted either by Landlord or an accountant to be designated by Landlord but not more often than once annually. Such audit shall be limited to items necessary to a determination of Tenant's Gross Sales and shall be conducted during normal business hours at the Premises. If it shall be determined as a result of such audit that there has been a deficiency in the payment of Additional Rent, such deficiency shall become immediately due and payable with interest at the rate of Eight percent (8%) per annum or the highest amount permitted by law, whichever is less, from the date such payment should have been made. In addition, if a Tenant's statement for any particular calendar year shall be found to have understated Gross Sales by more than three percent (3%), the Landlord is entitled to any Additional Rent as a result of such understatement, Tenant shall pay to Landlord all reasonable costs and expenses incurred by Landlord in determining and collecting the understatement or underpayment. If Tenant's statement shall be found to have understated Gross Top Line Sales by more than Ten percent (10%), such understatement shall, at Landlord's option, constitute a default under this Lease, thereby permitting Landlord, in Landlord's sole and absolute discretion, to terminate this Lease upon written notice to Tenant and an opportunity to cure. Any information gained from such statements or inspection shall be confidential and shall not be disclosed, except to carry out the purposes of this paragraph; provided, however, that Landlord shall be permitted to divulge the contents of any such statements in connection with any financing arrangements or assignments of Landlord's interest in the Premises, Project or Structure or in connection with any administrative or judicial proceeding in which Landlord is involved or where Landlord may be required to divulge such information.

(g) Tenant will provide Landlord annually twenty (20) $40 dollar gift coupons/cards ("Promotional Items"). Landlord intends to use the Promotional Items to build brand awareness of the Heights at Eastwood, Mimi's Sweet Shop, Inc. and the DDA. Annually, the Landlord will provide Tenant with an accounting of where the Promotional Items were distributed/leveraged along with a request for the next years Promotional Items. Any unused Promotional Items will be deducted from the next annual twenty (20) Promotional Items.

(h) Percentage Rent Table

| Annual Gross Sales | Percentage |
|---|---|
| Less than $800,000 | Base Rate Only |
| $800,001 - $925,000 | 8% |
| $925,001 - $1,050,000 | 9% |
| $1,050,001 - $1,200,000 | 10% |
| $1,200,001 - $1,350,000 | 11% |
| $1,350,001 or Greater | No Charge |

As a point of clarification, if Tenant's gross top line sales are less than $800,000 then only the Base Rent ($20.00 PSF (estimated at $60,000.00) in year one) is due. If the Tenant's gross top line sales are greater than $1,350,001 (in year one, or as adjusted per this Lease in following years) then the Tenant's Percentage Rent will be 11% of a maximum of $1,350,000 (in year one, or as adjusted per this Lease in following years).

### 3.2 *Taxes and Operating Costs.*

(a) Tenant shall pay their pro-rata share of all Operating Costs incurred levied or billed during the Term. Billing of such will occur periodically and will be due within 30 calendar days. Unpaid bills will be treated as unpaid Rent and Landlord will have the right to enforce Lease rights consistent with such.

(b) Tenant shall pay, before any penalty or interest attaches, all taxes levied or assessed against Tenant's personal property and shall, upon request, furnish to Landlord evidence of such payment.

(c) The Project's pro rata share of the costs recoverable from the Project by the Shopping Center as defined and established in the ECR will not exceed 3% of the Tenants base rent

### 3.3 *Utilities.*

Landlord shall: (a) install all utilities at its sole cost and expense (with separate metering for each lessee, including Tenant, if reasonably practicable), including any applicable impact, tap & hook-up fees, and (b) provide dumpsters for Tenant's refuse. Tenant shall fully and promptly pay for all fees in connection with the removal of any and all waste from the Premises and all water, sewer, gas, heat, light, power, janitorial services, communication service, cable television, telephone service and other public utilities of every kind furnished to the Premises in connection with Tenant's interior space and patio seating use throughout the Term and any Renewal Term (whether same is owed to Landlord or to any third party). The parties hereby agree that in addition, Landlord shall not be liable to any third party for payment of water or sewage system bills occurring subsequent to the filing of an appropriate affidavit or other notice with the appropriate governmental agency pursuant to statute. Tenant shall pay for any fencing, furnishing, landscaping, lighting, utilities, improvements, maintenance and permits concerning the patio space. In the event that any utilities or rubbish charges cannot be separately metered or separately contracted for by Tenant, and Landlord provides same, Landlord may allocate and recover from Tenant such charges as Operating Expenses in a commercially reasonable manner. Likewise, any such amounts which are billed by providers to Landlord for any reason (including, but not limited to, Tenant's non-payment of same and providers legal right to bill Landlord or person's through whom Landlord claims), may be billed as Operating Expenses from Landlord to Tenant.

### 3.4 *Security Deposit.*

(a) The equivalence of one month's rent (3,000 square feet x $20.00) / 12 months = $5,000) which will be credited to the first month's rent.

### 3.5 *Late Charges.* Because Tenant's late payment of Rent hereunder will cause Landlord to incur administrative, financing and other costs not subject to precise computation and not contemplated by this

Lease, if any Rent due from Tenant is not received by Landlord within five (5) days of when due, Landlord may at its discretion impose a late charge in the amount of Two Percent (2%) of such rental installment. Such Late Charge shall be due upon billing and become due as Rent. Acceptance of late charges shall constitute a waiver of Tenant's default with respect to the overdue amount. Provided, however, that if Tenant has engaged in a habitual default, meaning untimely payment of Base Rent, Additional Rent or Percentage Rent six (6) or more times in any twelve (12) month period, Landlord may exercise its remedies for Default under this Lease, despite accepting any Late Charges.

3.6 *Interest on Rent*. Rent which is not paid within five (5) days of when due shall bear interest from the date due until paid at a rate equal to Eight percent (8%) per annum or the highest amount permitted by law, whichever is less. The payment of such interest shall not excuse or cure any default by Tenant under this Lease. Such interest shall be included in Rent, due without further notice, and in addition to, and not in lieu of, any Late Charge imposed.

3.7 *Setoff; Obligation to Survive; Application of Payments.*

(a) Any Rent due under this Lease shall be paid by Tenant when due without any setoff, deduction, abatement, reduction or counterclaim whatsoever. Tenant's obligation to pay Rent that is accrued and unpaid hereunder shall survive the expiration or termination of the Term and any Renewal Term.

(b) Payments received from Tenant shall be applied by Landlord as follows: First, to any Late Charges due; then to accrued interest (whether Interest on Rent or otherwise); then to other charges due and unpaid; then to Operating Expenses, Additional Rent/Percentage Rent; then to Base Rent.

### ARTICLE 4

### Use of Common Areas

4.1 *Use of Common Areas*. Landlord hereby grants to Tenant the nonexclusive right to use the Common Areas solely for the purposes for which they were designed, subject to the following conditions:

(a) The Common Areas may also be used by anyone else to whom Landlord has or may hereafter in its sole discretion grant the right to use them so long as such use does not unreasonably interfere with Tenant's access, visibility or use of Tenant's Premises, including Patio;

(b) Tenant shall make no use of the Common Areas, which would unreasonably interfere in any way with the use of the Common Areas by any other person;

(c) Landlord shall have the right from time to time in its sole discretion to close, repair and modify the Common Areas, to change the location or character of them, and to adopt rules and regulations pertaining to them, so long as such actions made by Landlord do not unreasonably interfere with Tenant's business; and

(d) Tenant and its employees shall park their vehicles only in those portions of the parking area designated for that purpose by Landlord.

4.2 *Maintenance and Control*. Landlord shall maintain, operate and control the Common Areas, and the reasonable and necessary cost of same shall be and become "Operating Costs" as referenced by paragraphs 1.1(c) and 3.2 herein.

**ARTICLE 5**

*Preparation of the Premises*

5.1 *Landlord's Work and Tenant's Work.*

Following the Tenant's approved plans, the following obligations for build out will be demarcated between Landlord and Tenant:

*Landlord's Work and Tenant's Work.*

Following the Tenant's approved plans, the following obligations for build out will be demarcated between Landlord and Tenant:

1. Landlord Outline of an Acceptable Vanilla Shell

   a. Complete store front, including front door.

   b. Concrete slab ready to receive vinyl tile.

   c. Demised lease space to be sheet rocked, taped and spackled from the slab to the drop ceiling. Ready to paint.

   d. One bathroom for men and one for women to include per all governing local, state and federal (ADA) codes.  The toilet room(s) to consist of a toilet, sink, ten-gallon water heater, mirror, towel holder, toilet paper holder, grab bars and soap dispenser.

   e. Rear service door with lock and key.

   f. 400 amp (estimated capacity, exact requirement to be sized by Tenant's mechanical engineer) 3-Phase electrical service to space.

   g. HVAC: (Heating, Ventilation, and Air Conditioning)
   The Landlord is to furnish and install a complete HVAC system.  The system must be minimum of one ton per 350 square foot of total leased area and include all ductwork, diffusers, power wiring, control wiring and roof cuts. All areas of the store must be air conditioned including stockroom.

   h. The Landlord will provide one (1) interior partition "sales to stock room wall" with one door 3'-0" c 6'- 8" solid core with hardware installed under tenant's plan. This interior partition to be a minimum of 10' high built of metal or wood studs 16" on center and covered with 5/8" fire rated (type 'X') drywall, taped and finished both sides ready to receive paint. Landlord shall extend walls from the floor to the underside of the roof decking.

   i. Sprinkler system in place and "turned up."

   j. Following the Tenant's plans which have been approved by the Ingham County Health Department, the Landlord will install a drain for a triple sink, an employee wash sink and an ice cream dipping station.

Any items not specifically listed as Landlord's work above shall be the responsibility of the tenant.

2. Tenant Outline of Vanilla Shell

a. Plans for the Finish
Tenant will provide detailed plans for the finish of the store.

b. Permits
The Landlord will be responsible for obtaining the building permit for their work and for compliance with all codes with respect to their work based upon plans prepared by Tenant. Tenant will be responsible for obtaining his/her own permit to complete store from Landlord shell.

c. Workmanship
All work done by tenant or Landlord will comply with local, state and national codes and done in a good workmanship-like manner using new materials.

d. Signs
Landlord will allow tenant to install tenant's federally registered and recognized exterior identification signage. Tenant will supply and install tenant's logo sign(s). The Landlord must provide electrical connection for the sign(s). Landlord will permit tenant to install interior signs within the storefront window area. Signs will be suspended from the ceiling no more than 12" back from the storefront glass.

e. Trade Hardware and Fixtures
Tenant will supply and install all trade hardware and fixtures.

f. Demolition
The Landlord, at Landlord's expense, will do any demolition required to prepare the store for construction, including but not limited to, all interior walls. All trade fixtures and property of previous tenants including the removal of all old flooring, materials and signs shall be removed by Landlord.

g. Concrete Slab
The Landlord will supply a concrete slab. If existing, Landlord will put into a like-new condition with all cracks and depressions filled and all floor coverings removed. Slab must be sealed to prevent water from entering premises.

h. Electrical In Slab
The tenant will do any cutting or patching of concrete floor required to install the tenant's electrical requirements. Landlord will allow tenant to do this work.

i. Electrical Service
The Landlord is to provide electrical service to the rear of the space. A panel capable of handling 42 circuits will be provided by Landlord. Landlord to install duplex receptacles on all demising walls every 15' or per code if more. Landlord will install all breakers required to operate and control all Landlord supplied outlets and equipment. Landlord will install any required exit signs and/or emergency lights to code.

j. Florescent Fixtures
Tenant is to completely supply, connect and put in working order all fixtures. Specifications will be submitted by tenant and approved by Landlord.

k. Decorative Lighting:
The tenant shall furnish and install tenant's decorative lighting package.

l. Floor Coverings
Tenant will supply and install as shown in tenant's plans.

m. Painting and Wall Covering
Landlord shall paint all visible surfaces with one coat of primer.

n. Ceiling
The Tenant is to supply and install a new ceiling, if desired by Tenant

o. Conduit
The Landlord will provide telephone conduit and pull wires to the demises premise. Conduit to be located next to the electrical panel.

3. Extras
Tenant is not to be charged for "extras" or what is commonly referred to as "Landlord Chargebacks" without prior written authorization and acceptance of such costs by tenant.

4. Substitutions of Materials
Subject to tenant's prior written approval.

5. Cleaning
Store to be turned over to tenant broom cleaned with all labels, stickers, paint and wrapping materials removed from windows and floors as to require only normal washing and cleaning for opening of business.

6. Start of Tenant's Work
Tenant will not be required to start his work until the Landlord has finished his work. Landlord is required to give tenant seven (7) days written notice of turnover of space.

7. Certificate of Occupancy
Tenant will be responsible for obtaining from the local authorities a Certificate of Occupancy to open his/her store. The Landlord warrants that their work, whether completed or not, will not interfere with the tenant obtaining a Certificate of Occupancy and opening his/her store. Landlord will reimburse the tenant for any and all costs incurred due to not being able to obtain a Certificate of Occupancy and open his/her store due to Landlord's work.

5.1 *Covenant Against Liens*. Nothing in this Lease shall authorize Tenant to, and Tenant shall not, do any act which will in any way encumber the title of Landlord in and to the Premises, nor shall the interest or estate of Landlord in the Premises be in any way subject to any claim whatsoever by virtue of any act or omission of Tenant. Under no circumstances shall the interest of Landlord in and to the Property or Project be subject to liens for improvements made by Tenant or subject to any construction, mechanic's, laborer's or materialman's lien or any other lien or charge on account of or arising from any contract or obligation of Tenant. Tenant shall remove any lien or encumbrance on its interest in the Premises within ten (10) days after it has arisen; provided, however, that Tenant may in good faith contest any such item if it notifies Landlord in writing thereof and posts a bond or other adequate security with Landlord. In the event that Tenant fails to discharge or bond over any lien within the time required, Landlord may do same and charge the costs of such discharge or bond to the Tenant as Operating Expense.

## ARTICLE 6

### Alterations

6.1 *Alterations by Tenant.*

(a) Except as permitted by Article 5 or required by Section 8.1, Tenant shall not, without the prior written consent of Landlord (which will not be unreasonably withheld or delayed), make any alterations, improvements, additions or physical changes (hereinafter referred to as "Alterations") to the Premises.

(b) Unless Landlord otherwise directs in writing, no Alterations made or installed by Tenant (NOT including ANY moveable equipment OR trade fixtures) shall be removed by Tenant from the Premises at the termination of this Lease. Instead, all such Alterations shall, when installed, attach to the freehold and become and remain the property of Landlord.

(c) Approved Tenant Alterations shall be subject to the provisions of Article 5 above, as if they were "Tenant's Work."

6.2 *Signs.* All exterior Tenant signage shall be subject to the review and approval of Landlord, which shall not be unreasonably withheld, conditioned or delayed. Due to the unique entertainment character of the Project, there are specific expectations in place for exterior signage. All exterior signage must be installed prior to the Premises being open to public. All exterior signage shall be in compliance with any sign criteria, if any, now or hereinafter contained in the ECR, Master Deed (including any sub-master deed for the Sub-condominium, if any) and/or adopted by Landlord and/or approved by the Township of Lansing (and all other applicable governmental or quasi-governmental entities), including all amendments and modifications thereto ("Sign Criteria"). Additionally, Tenant shall not place any signs, placards, names, insignia, trademarks, or any other similar item or items outside, on or within thirty-six inches (36") of, the front lease line, or on the store front, the glass panes and supports of the show windows, or on any window, door, roof or perimeter wall of the Premises, or which is otherwise visible from the Project common areas, except such as Landlord shall approve in its sole discretion. Notwithstanding anything to the contrary in this Lease, Tenant shall not affix any signs to the roof of the Premises. Tenant shall utilize no advertising medium (other than signage permitted or approved pursuant to the preceding sentence) within the Premises or within the Common Areas which can be heard or experienced outside the Premises. Tenant shall not display, paint or place any handbills or other advertising devices on any vehicle parked in the parking area of the Project, whether belonging to Tenant or to any other person, nor shall Tenant distribute in the Project any handbills or other advertising devices. In no event may Tenant display any banner of any size or kind outside the Premises without Landlord's prior written consent, which consent may be granted or withheld in Landlord's sole discretion. Tenant may erect and maintain signs in and on the Premises as permitted by local ordinance. All Tenant signage shall be permitted, manufactured and installed at Tenant's sole cost and expense. Tenant shall also apply for any necessary permits and procure any necessary approvals from the appropriate governmental entity, including the Township of Lansing, relative to its signage. Landlord agrees that Tenant shall have the right to install its trade logo or customary signage on any and all multi-tenant signage associated with the Project, regardless of its location being within the Project, including any and all pylon signs, pedestrian way signs, directory signs, street signs, billboards, commercial vehicles, and the like, and Tenant shall pay its proportionate share of installing and deploying such signage based on Tenant's square foot usage of such signage, and Landlord shall guaranty that Tenant's proportionate signage shall be no smaller than the largest panel or portion available or being used by any other Project tenant or other sign user. Tenant shall be allowed to install "wall" and "pedestrian blade" signage on the south and east side of Tenant's Structure, provided that Tenant pay its proportionate share of such sign usage. Tenant is specifically prohibited from installing or placing any signage for any type of liquidation sale, going out of business sale, moving sale, or anything related, as such advertisement will have a negative impact on Landlord's property. Subject to the restrictions, above, Landlord hereby gives its consent to Tenant to construct the Premises in accordance with standard decor and to erect standard signs/awnings on the Structure. Tenant's signs shall measure at least 36" high and extend the length of the fascia. The phrase "standard signs" shall be deemed to include existing pole signs, monument signs

and awnings. Additionally, Tenant may use standard neon tubing and window advertising including but not limited to neon "open" signs and static cling(s). Landlord further acknowledges and agrees that this consent is absolute and Tenant shall not be required to submit any of the aforementioned items for Landlord's review. However, Tenant agrees that any signage installed by Tenant shall conform to local codes and ordinances. In the event Tenant shall be prohibited from utilizing the standard décor and signage, Landlord and Tenant shall use best efforts to obtain a variance or applicable approvals.

6.3 *Additional Construction by Landlord.* Landlord reserves the right at any time to make alterations, expansions or additions to the Project, so long as they do not unreasonably interfere with Tenant's business. No changes or additions by the Landlord will inhibit access to or visibility of the Premises or decrease parking ratio. Tenant is allowed, at its cost, to prune, cut back or replant with slim trees all trees surrounding the exterior of the Premises subsequent to receiving written permission from the Landlord.

6.4 *Access and Road Alterations.* If Tenant's operation or use is at any time impaired or affected by the closing, relocation, alteration or improvement of any street abutting the Premises, Tenant may, at its option, either terminate this Lease, or reduce the rent payable by fifty percent (50%) during the period of such closing, relocation, alteration or improvement. Either of these options may be implemented upon thirty (30) days written notice to the Landlord.

## ARTICLE 7

### Repairs

7.1 *Repair and Maintenance of Premises.* Except as provided in Section 7.2 below and Section 4.2 above, Tenant shall at its expense keep and maintain the Premises, and each component of the Premises, in a good and clean operating condition. Tenant's obligations shall include, but not necessarily be limited to, the replacement of broken glass and the cleaning, repair and maintenance (including all necessary replacements) of all doors, windows and storefronts, the interior portions of the Premises, and all heating, air conditioning, mechanical, electrical, and plumbing systems serving the Premises, any building security system and all other interior components. In this regard, Tenant shall have at least semi-annual inspections and maintenance performed on the heating and air conditioning units. Evidence of said inspections and maintenance will be documented and kept on file by Tenant for Landlord's review with a 30 days written notice for evidence of the same. If Tenant shall fail to perform any required repair or maintenance, then, upon thirty (30) days written notice (or such shorter time as is reasonable in exigent circumstances) Landlord may perform same and charge them to Tenant as set forth in section 10.7.

7.2 *Structural Repairs.* Landlord shall at its expense (or, in the event of any Sub-condominium, procure that it shall at its or the Sub-condominium's expense) keep the foundation, roof (except for roof penetrations caused by Tenant's Work), exterior walls and all load-bearing portions of the Structure in good repair throughout the Term. However, Landlord may recover from Tenant the cost of any such repairs occasioned by the tortious acts or negligence of Tenant, its agents, employees, invitees, guests or licensees, except to the extent that Landlord is reimbursed therefor under any policy of insurance. Landlord shall be neither liable nor responsible for any loss that may accrue to Tenant or Tenant's business by reason of Landlord's actions in fulfilling its obligations hereunder. Landlord shall not be required to make any other improvements or repairs of any kind upon the Premises.

## ARTICLE 8

### Tenant's Covenants; Landlord's Lien

8.1 *Laws, Ordinances and General Conditions.*

Tenant, at its expense, shall comply promptly with (i) all laws, ordinances, orders, legal or contractual documents and regulations affecting its use or occupancy of the Premises or any Alterations it has made to the Project or the Premises; and (ii) the recommendations of any insurance company, inspection bureau or similar agency with respect thereto.

### 8.2 *Hazardous Materials.*

(a)    Tenant, at its sole cost and expense, shall comply with all laws relating to the storage, use, handling and disposal of "Hazardous Materials".  As used in this Lease, the term "Hazardous Material(s)" includes, without limitation, any hazardous or toxic material, substance or waste, such as (a) those materials identified in those described in the Comprehensive Environmental Response Compensation and Liability Act of 1980, as amended, 42 U.S.C. Section 9601 et seq., the Resource Conservation and Recovery Act, as amended, 42 U.S.C. Section 6901 et seq., (b) any material, substance or waste which is toxic, ignitable, corrosive or reactive and which is regulated by any local governmental authority, any agency of the State of Michigan or any agency of the United States government, (c) any other material, substance or waste which is defined or regulated as a hazardous material, extremely hazardous material, hazardous waste or toxic substance pursuant to any law, rule, regulation or order of the United States government, the State of Michigan or any local governmental body, (d) asbestos, (e) petroleum and petroleum-based products, (f) formaldehyde, (g) polychlorinated biphenyls (PCBs), and (i) freon and other chlorofluorocarbons.

(b)    With the exception of normal cleaning supply items maintained at the Premises, which cleaning supplies shall be maintained in accordance with all applicable laws relating to Hazardous Materials, Tenant shall not store, use, handle or dispose of any Hazardous Material in the Premises, Structure or Project without Landlord's prior written consent, which Landlord shall be entitled to grant, withhold, or condition as Landlord deems appropriate in Landlord's sole and absolute discretion. Tenant's storage, use, handling or disposal of Hazardous Materials without Landlord's prior written consent shall constitute a material default under this Lease.  Landlord shall not store, use, handle or dispose of any Hazardous Material in the Premises, Structure or Project in violation of any federal, state or local laws.

(c)    Tenant shall promptly notify and provide Landlord with copies of all reports filed pursuant to any self-reporting requirements, applicable law or this Lease, permit applications, permits, monitoring reports, workplace and community-exposure warnings or notices, orders, reports, notices, listings and correspondence (even those considered confidential) of or concerning the release or threatened release, investigation of, compliance, clean-up, remedial and corrective action or abatement of Hazardous Materials including, but not limited to, reports and notices, complaints, pleadings and other legal documents filed against Tenant and/or the Premises related to Tenant's use, handling, storage or disposal of Hazardous Materials in the Premises, Structure or Project.

(d)    The clean-up and disposal of all Hazardous Materials within the Premises, including any required monitoring and documentation, shall be performed at Tenant's sole cost and expense.  The extent of the clean-up shall be determined solely in accordance with environmental laws or any Landlord lender.  Landlord shall have the right to supervise any such clean-up and disposal by Tenant.  Within forty-five (45) days following the clean-up of any Hazardous Materials by or at the direction of Tenant, Tenant shall furnish to Landlord Hazardous Materials manifests and records which document proper transport and disposal of such material.  The foregoing notwithstanding, Landlord, in its sole discretion, may elect by written notice to Tenant to perform the clean-up and disposal of any such Hazardous Material.  In such event, Tenant shall pay to Landlord, as additional rent, the actual cost of same upon receipt from Landlord of a written invoice therefor.

(e)    Tenant shall permit Landlord, its agents and employees to enter the Premises at any time, without prior notice, to inspect or take action with respect to Hazardous Materials.

(f)      Tenant shall be solely responsible for and shall defend, indemnify and hold Landlord and Landlord's directors, officers, shareholders, partners, agents and employees harmless from and against all claims, judgments, liabilities, costs and expenses, including attorneys' fees and costs, arising out of or connected with its storage, use handling or disposal of Hazardous Materials on the Premises except to the extent such Hazardous Materials were installed or placed on the Premises by Landlord.  In addition, except with respect to any Hazardous Material installed in or placed on the Premises by Landlord or any agent, employee or contractor of Landlord, Tenant shall be solely responsible for and shall defend, indemnify and hold Landlord, Landlord's directors, officers, shareholders, partners, agents and employees and the Premises harmless from and against all claims, judgments, liabilities, costs and expenses, including attorneys' fees and costs, arising out of or connected with the removal, clean-up and/or restoration work and materials necessary to return the Premises, and the Project to their condition existing before the appearance of the Hazardous Materials on the Premises.  Tenant's obligations under this Section shall survive the expiration or early termination of this Lease.

## ARTICLE 9

### Damage to Premises; Eminent Domain; Indemnity; Insurance

9.1 *Destruction, Fire or Other Cause.*

(a) Subject to the provisions of Subsection 9.1(b) below, if the Premises shall be rendered untenable by fire or other casualty, Landlord shall (to the extent of available insurance proceeds and to the extent not prohibited by law from doing so) restore the Premises (excluding Tenant's trade fixtures and improvements) and make them tenable as soon as possible. Except in the case of damage caused by Tenant or its agents, employees, contractors, guests or licensees, Rent shall abate during the period of untenability in proportion to the area of the Premises rendered untenable. All such restoration shall be completed within 180 days of the Premises being rendered untenable or Tenant shall, as its sole remedy, be entitled to terminate this Lease.

(b) If the Premises, or the building that the Premises are a part, shall be so damaged by fire or other casualty that demolition or substantial reconstruction (more than 40% of its initial cost) is required, then Landlord may terminate this Lease by notifying the Tenant of such termination within thirty (30) days after the date of such damage. Rent shall be prorated to the date of such casualty.

(c) Tenant shall immediately notify Landlord of the occurrence of a fire or other casualty at the Premises and shall at its expense restore or replace its personal property, fixtures and tenant improvements. There shall be no abatement of Rent during any delay caused by the failure of Tenant to complete its restoration and repair work.

9.2 *Eminent Domain.* If the whole or a substantial part of the Premises shall be taken by any lawful authority under the power of eminent domain, then this Lease shall thereupon terminate and Tenant shall be liable for Rent only up to the date of such termination.  In the event of the condemnation of the Premises, Tenant is entitled to participate in any and all awards for such taking to the extent that any such award includes the loss, if any, sustained by Tenant as a result of the termination of this Lease for loss of business, fixtures, goodwill, moving expenses and attorneys' fees and costs, to the fullest extent permitted by law.  In no event shall Tenant's claim reduce and/or diminish Landlord's award.

9.3 *Indemnification; Tenant's Property.*

(a) Tenant shall defend and indemnify Landlord against and hold it harmless from any and all liabilities, obligations, damages, penalties, claims, costs and expenses, including reasonable attorneys' fees, paid or incurred as a result of or in connection with (i) Tenant's use or occupancy of the Premises, (ii) any breach by Tenant, any subtenant, or any of their agents, contractors, employees, customers, invitees,

or licensees, of any covenant or condition of this Lease, or (iii) the carelessness, negligence or improper conduct of the Tenant, any subtenant, or any of their contractors, employees, customers, invitees, or licensees. If any action or proceeding is brought against Landlord by reason of any such claim, Tenant, upon written notice from Landlord, shall, at Tenant's expense, resist or defend such action or proceeding by counsel approved by Landlord in writing. Similarly, Landlord shall defend and indemnify Tenant against and hold it harmless from any and all liabilities, obligations, damages, penalties, claims, costs and expenses, including reasonable attorneys' fees, paid or incurred as a result of or in connection with (i) Landlord's use or occupancy of the Structure, Property, and Premises, (ii) any breach by Landlord, its tenants or subtenants, or any of their agents, contractors, employees, customers, invitees, or licensees, of any covenant or condition of this Lease, or (iii) the carelessness, negligence or improper conduct of the Landlord, any subtenant, or any of their contractors, employees, customers, invitees, or licensees. If any action or proceeding is brought against Tenant by reason of any such claim, Landlord, upon written notice from Tenant, shall, at Landlord's expense, resist or defend such action or proceeding by counsel approved by Tenant in writing.

(b) Tenant shall bring or keep property upon the Premises solely at its own risk, and Landlord shall not under any circumstances be liable for any damages thereto or any destruction or theft thereof. Tenant shall maintain a policy of insurance against risk of loss from any cause whatsoever to all such property, and, in addition, all plate glass upon or appurtenant to the Premises, to the full extent of their replacement cost, which policy of insurance shall contain a clause or endorsement under which the insurer waives, or permits the waiver by Tenant of, all right of subrogation against Landlord, and its agents, employees, customers, invitees, guests, or licensees, with respect to losses payable under such policy. Tenant hereby waives all right of recovery which it might otherwise have against Landlord, and its agents, employees, customers, invitees, guests, or licensees, for any damage to Tenant's property which is (or by the terms of this Lease is required to be) covered by a policy of insurance, notwithstanding that such damage may result from the negligence or fault of Landlord, or its agents, employees, customers, invitees, guests, or licensees. Any deductible amount included in such policy shall be treated as though it were recoverable under the policy.

9.4 *Insurance.* By this Section, and by the applicable portions of Section 9.3 above, Landlord and Tenant intend that the risk of loss or damages as described shall be borne by responsible insurance carriers to the extent provided.

(a) Landlord shall insure the Project against loss or damage under a policy or policies of casualty insurance. Such policies shall include a waiver of subrogation clause or endorsement similar to that required of Tenant in Section 9.3(b) above.

(b) Tenant shall maintain workers' compensation insurance covering all of its employees to at least the statutory limit set forth under Michigan law, and a policy of commercial public liability insurance in an amount at least equal to One Million Dollars ($1,000,000.00) single limit coverage per occurrence and Two Million Dollars ($2,000,000.00) in the aggregate, for property damage, bodily injury or death. Such policy of general public liability insurance shall name Landlord, Landlord's mortgagee or beneficiary and Landlord's managing agent as additional insured and shall be underwritten by a carrier and on such other terms and conditions as Landlord shall approve. It shall provide by endorsement or otherwise that such insurance may not be canceled, terminated, amended, or modified for any reason whatsoever, except upon thirty (30) days' prior written notice to Landlord. Prior to the time such workers' compensation and general public liability insurance is first required to be carried by Tenant, and thereafter at least fifteen (15) days prior to the expiration of any such policy, Tenant shall deliver to Landlord either duplicate originals of the aforesaid policies or a certificate evidencing such insurance coverage, together with evidence of payment for the policies. If a certificate is provided, it shall contain a statement substantially in the form of the immediately preceding sentence. Furthermore, Tenant shall obtain: (i) Business interruption or loss of income insurance in amounts sufficient to cover Tenant's actual projected income, subject to a non-reducible limit equal to at least the Base Rent and all Additional Rent due under the Lease for a period of not less than three (3) months. Such policy, or policies, of insurance as Tenant shall provide to comply with this provision shall be endorsed to

expressly reflect that Landlord shall be a beneficial loss payee, as its interests may appear; (ii) Any insurance policies designated necessary by Landlord with regard to Tenant's, or Tenant's contractors', construction of Tenant's Work, as well as with regard to the construction of Alterations including, but not limited to, contingent liability and "all risks" builders' risk insurance shall be carried in amounts and on forms and with carriers acceptable to Landlord. Tenant shall not commence construction of any type without prior approval of such coverage and carriers and the Tenant's delivery to Landlord of proof of coverage and endorsement of such policies as to the beneficial interest of the Landlord as loss payee, as its interests may appear. All such other coverage, as the Landlord may carry in response to any and all other provisions of this policy shall be properly endorsed by providing carriers, acknowledging their consent to such additional risks as may be inherent in such construction operations. If Landlord or Landlord's mortgagee or beneficiary deems it necessary to increase the amounts or limits of insurance required to be carried by Tenant under this Lease, Landlord may reasonably increase such amounts or limits, and Tenant shall so increase the amounts or limits of the insurance required to be carried by Tenant under this Lease and shall provide Landlord with policies or certificates indicating the increased amounts or limits as provided in this Section.

(c) Tenant agrees that it will not at any time during the Term or any Renewal Term carry any stock of goods or do anything in or about the Premises which will tend to increase the insurance rates upon the Structure or the Project. Tenant shall immediately pay to Landlord upon demand the amount of any increase in premiums for insurance against loss by fire or any other peril normally covered by fire and extended coverage insurance that may be charged during the Term or any Renewal Term on the amount of insurance to be carried by Landlord on the Structure resulting from the foregoing or from Tenant's doing any act in or about the Premises which does so increase the insurance rates, whether or not Landlord shall have consented to such act on the part of Tenant. If Tenant installs upon the Premises any electrical equipment which constitutes an overload on the electrical lines of the Premises, Tenant shall, at its own expense, make whatever changes or provide whatever equipment safeguards are necessary to comply with the requirements of the insurance underwriters and any governmental authority having jurisdiction over the Premises, but nothing contained in this Lease shall be deemed to constitute Landlord's consent to such overloading.

(d) Neither Landlord nor any of Landlord's agents or lenders make any representation that the types of insurance and limits specified to be carried by Tenant under this Lease are adequate to protect Tenant. If Tenant believes that any such insurance coverage is insufficient, Tenant shall provide, at its own expense, such additional insurance as Tenant deems adequate. Nothing contained in this Section shall limit Tenant's liability under this Lease.

## ARTICLE 10

### Default and Remedies; Termination and Surrender

10.1 *Landlord's & Tenant's Remedies*. In the event of any default by Landlord in the performance of any promise or obligation to be kept or performed hereunder and the default continues for a period of thirty (30) days after receipt by Landlord of a written notice from Tenant specifying the default, provided, however, if the nature of Landlord's obligation is such that more than thirty (30) days are required for performance, then Landlord shall not be in default if Landlord commences performance within such thirty (30) day period and thereafter diligently prosecutes the same to completion, in no such event Tenant, Tenant's remedies shall be limited to an action at law for monetary damages. In no event shall Landlord be liable for incidental or consequential damages or Tenant's lost profits resulting from Landlord's default. In the event Landlord unreasonably delays remedy of its default, Tenant, at its election, can declare this Lease terminated and void and vacate the Premises within an additional period of thirty (30) days, paying rent only to the date of said vacating. Landlord agrees to notify Tenant in writing in accordance with this Lease of any back charges due under this agreement or of any changes in the Rent, including, but not limited to Base Rent, Percentage Rent or Additional Rent, as and when they become due. All parties agree and acknowledge that time is of the essence with respect to these matters. In the event that Landlord does not appropriately notify Tenant within one hundred twenty 120) days of the date upon which said charges had become due, Landlord agrees that it has waived its rights to said back charges and further, that Tenant shall not be obligated to pay, nor shall it have any liability for these back charges. It is agreed that it is the intent of the parties that all charges be assessed in a timely manner as they accrue and in no event shall they be assessed to Tenant after this one hundred twenty 120) day period.

Landlord and Tenant acknowledge that it is extremely important that Rent be paid in a timely manner as required by this Lease. If Tenant shall fail to make any payment of any Rent due hereunder within five (5) days of its due date, or if Tenant shall fail to perform any of the other covenants or conditions which Tenant is required to observe and perform under this Lease for a period of thirty (30) days following written notice of such failure (or such shorter period of time as may be appropriate in exigent circumstances), or if Tenant fails to make any other payment due to Landlord under this Lease or any other agreement within thirty (30) days of its due date, or if Tenant shall abandon or vacate the Premises during the Term of this Lease for a period longer than thirty (30) days (provided that this shall not include any period of remodeling or alteration, if approved by Landlord and pursued with commercially diligence) , or if Tenant shall dissolve, die, become legally incompetent, then Landlord may, but need not, treat the occurrence of any one or more of the foregoing events as a default under this Lease, and thereupon may, at its option, by providing ten (10) days written notice to Tenant, execute any one of the following-described remedies in addition to all other rights and remedies provided at law or in equity:

(a) Terminate this Lease, and repossess the Premises in accordance with the provisions of Section 10.2 hereof, and be entitled to recover, as liquidated agreed final damages, in lieu of any further deficiencies, the immediate succeeding twelve (12) month's Base Rent due to be paid by Tenant during the balance of the current Term of this Lease (not including any Rent due under outstanding Renewal Terms.)

(b) Terminate Tenant's right of possession and repossess the Premises without further demand or notice of any kind to Tenant other than in a district court summary proceeding action and without terminating this Lease, in which case Landlord may, but need not, relet all or any part of the Premises for such rent and upon such commercially reasonable terms as shall be satisfactory to Landlord. For the purposes of such reletting, Landlord may make such repairs, alterations, additions, or physical changes in or to the Premises as may be necessary or convenient. If the Premises are relet and a sufficient sum shall not be realized from the reletting, after payment of all costs and expenses of such repairs, alterations, additions, or physical changes and the expense of such reletting and the collection of rent occurring therefrom, to satisfy the Rent herein provided to be paid during the remainder of the Term or any active and current Renewal Term, Tenant shall satisfy and pay any such deficiency upon demand, not to exceed the equivalent of the immediately succeeding twelve (12) month's Base Rent due to be paid by Tenant during the balance of the

current Term of this Lease (not including any Rent due under outstanding Renewal Terms.). Tenant agrees that Landlord may file suit to recover any sums falling due under the terms of this paragraph from time to time and that any suit or recovery of any portion due Landlord hereunder shall be no defense to any subsequent action brought for any amount not theretofore reduced to judgment in favor of Landlord.

For good and valuable consideration, Landlord agrees to the following provision: In the event of a default by the Tenant, Landlord acknowledges an affirmative duty to mitigate damages and shall in no event accelerate Rent due to the remainder of the Term or any Renewal Term. Further, Landlord and Tenant agree that Tenant's liability upon default shall not exceed twelve (12) month's Base Rent or the remainder due pursuant to this Lease (not including any Rent due under outstanding Renewal Terms), whichever is less. Upon the termination of this Lease, whether in accordance with this Section or otherwise, Tenant shall be permitted access to the Premises to remove any and all logo or trademark items. Such items shall include, but shall not be limited to, signage and murals.

10.2 *Termination; Surrender of Possession.*

(a) Upon the expiration or termination of this Lease, whether by lapse of time, operation of law or pursuant to the provisions of this Lease, Tenant shall:

(i) Restore the Premises to their condition at the beginning of the Term (other than as contemplated by Section 7.1 above and the balance of this section, below), ordinary wear and tear excepted, remove all of its personal property and trade fixtures from the Premises and the Project and repair any damage caused by such removal, at Tenant's sole cost and expense. All alterations and fixtures including, without limitation, those in the nature of ventilating, air conditioning, unmovable refrigeration, unmovable cooking equipment, plumbing, sprinkling systems, outlets, partitions, doors, vaults, paneling, molding or flooring shall be surrendered with the Premises and Tenant shall not remove them.

(ii) Surrender possession of the Premises to Landlord; and

(iii) At Tenant's cost and expense, remove from the exterior and interior of the Premises and the Structure all (A) signs, symbols and trademarks which are connected with or associated specifically with Tenant's business and repair any damages to the Structure or the Premises caused by such removal, (b) refuse, trash and scrap materials, and (c) any and all personal property of Tenant.

(b) If Tenant shall fail or refuse to restore the Premises as hereinabove provided, Landlord may do so and recover its costs from Tenant for so doing. If Tenant shall fail or refuse to comply with Tenant's duty to remove all personal property and trade fixtures from the Premises upon the expiration or termination of this Lease, the parties hereto agree and stipulate that Landlord may, at its election: (i) treat such failure or refusal as an offer by Tenant to transfer title to such property to Landlord, in which event the title thereto shall thereupon pass under this Lease as a bill of sale; or (ii) treat such failure or refusal as conclusive evidence, on which Landlord shall be entitled to rely absolutely, that Tenant has forever abandoned such property. In either event, Landlord may, with or without accepting title thereto, keep or remove, store, destroy, discard, or otherwise dispose of all or any part of such property in any manner that Landlord shall choose without incurring liability to Tenant or to any other person or entity. In no event shall Landlord ever become or be charged with the duties of a bailee of any property of Tenant. The failure of Tenant to remove any property from the Premises shall forever bar Tenant from bringing any action or asserting any liability against Landlord with respect to any property, which Tenant fails to remove.

(c) This Lease shall perpetually continue on a month-to-month basis and remain in full force and effect at the termination or expiration of this Lease without the necessity of notice from either Landlord or Tenant of such continuance. Such month-to-month tenancy may be terminated by either Landlord or Tenant by providing a thirty (30) day written notice to the other party. If Tenant shall fail to or refuse to surrender possession of the Premises to Landlord upon termination or expiration of this Lease, Landlord may immediately re-enter the Premises and dispossess all persons and effects therefrom using such force as

permitted by law by providing the greater of: (i) thirty (30) days written notice to Tenant, or (i) such notice as required by law. Landlord shall also be entitled to such other remedies as may be provided it by law or in equity.

10.3 *Holding Over.* Tenant acknowledges that its holding over beyond the time of the termination or expiration of this Lease will cause Landlord additional expense. If Tenant shall remain in possession of the Premises, or any part thereof, after the termination or expiration of this Lease, Tenant shall acquire no rights with respect to the Premises. Tenant shall, however, pay Landlord, as liquidated damages, one hundred ten percent (150%) of the amount of Rent, which would have been due for a like period of occupancy during the Term hereof. The provisions of this clause shall not operate as a waiver by Landlord of any right it may otherwise have.

10.4 *Assignment and Subletting.*

(a) Provided that Tenant seeks to undertake an assignment or subletting to a business that has reasonably sufficient financial wherewithal to honor the terms of this Lease, Tenant shall not be required to obtain Landlord's consent or permission in any manner whatsoever and shall have the sole, exclusive, and irrevocable right to (i) assign this Lease including any and all interests hereunder to a business which has the same Use as defined in Section 2.2 and does not violate any limitations or restrictions set forth in this Lease; (ii) permit assignment hereof by operation of law to a like kind business; (iii) sublet the Premises or any part thereof to a business which has the same Use as defined in Section 2.2 and does not violate any limitations or restrictions set forth in this Lease; or (iv) permit the use of the Premises by another party for a business which has the same Use as defined in Section 2.2 and does not violate any limitations or restrictions set forth in this Lease.  In order to determine if the business has sufficient financial wherewithal, Tenant shall notify Landlord of any prospective transfer at least thirty (30) days prior to the prospective transfer; if Landlord does not object or request additional information within five (5) business days, then Tenant may effect the transfer; it Landlord does object or provide additional information, Tenant shall provide such information within five (5) business days, and Landlord shall have five (5) business days to approve or reject same; if Landlord does not timely object, then Tenant may effect the transfer; if Landlord does object, then Tenant shall not effect the transfer until the objection is resolved by the Parties or adjudication.

(b) In the event of any assignment or subletting to a business which has the same Use as defined in Section 2.2 and does not violate any limitations or restrictions set forth in this Lease, Tenant shall not be obligated to provide any type of compensation to Landlord whatsoever.  Assignment or subletting to a business which does not have the same Use as defined in Section 2.2 and/or which may  violate any limitations or restrictions set forth in this Lease is specifically precluded without Landlord's express written permission.

10.5 *Bankruptcy.*

(a) If following the filing of a petition by or against Tenant in a bankruptcy court, Landlord shall not be permitted to terminate this Lease as hereinabove provided because of the provisions of Title 11 of the United States Code relating to Bankruptcy, as amended (the "Bankruptcy Code"), then Tenant (including Tenant as Debtor-in-Possession) or any trustee for Tenant agrees to promptly, but no later than sixty (60) days after petition by Landlord to the bankruptcy court, assume or reject this Lease, and Tenant agrees not to seek or request any extension or adjournment of any petition to assume or reject this Lease by Landlord with such court. Tenant's or the trustee's, failure to assume this Lease within said 60-day period shall be deemed a rejection. Landlord shall thereupon immediately be entitled to possession of the Premises without further obligation to Tenant or the trustee, and this Lease shall be terminated, except that Landlord's right to damages for Tenant's default shall survive such termination.

(b) Tenant or any trustee for Tenant may only assume this Lease if (i) it cures or provides adequate assurance that the trustee will promptly cure any default hereunder, (ii) it compensates or provides adequate assurance that the Tenant will promptly compensate Landlord for any actual pecuniary loss to Landlord resulting from Tenant's default, and (iii) it provides adequate assurance of future performance under this Lease by Tenant. In no event after the assumption of this Lease by Tenant or any trustee for Tenant shall any then-existing default remain uncured for a period in excess of thirty (30) days. Adequate assurance of future performance of this Lease shall include, without limitation, adequate assurance (A) of the source of Rent required to be paid by tenant hereunder, and (B) that assumption or permitted assignment of this Lease will not breach any provision hereunder.

10.6 *Remedies Cumulative.*

(a) The failure of either party to enforce any covenant or condition of this Lease shall not be deemed a waiver thereof or of the right of either party to enforce each and every covenant and condition of this Lease. No provision of this Lease shall be deemed to have been waived unless such waiver shall be in writing and signed by the person against whom the waiver is claimed.

(b) All rights and remedies of Tenant and Landlord under this Lease shall be cumulative, and none shall exclude any other rights or remedies allowed by law.

10.7 *Expenses of Enforcement; Performance by Landlord.*

(a) The prevailing party in any litigation involving this Lease shall be entitled to recover, in addition to any other relief obtained, the costs and expenses, including reasonable attorneys' fees and expenses, incurred by the prevailing party.

(b) If Tenant shall fail to perform any of its obligations hereunder, Landlord may without notice perform such obligations. If Landlord incurs any costs in connection therewith, they shall be paid by Tenant to Landlord upon demand as Additional Rent, with interest thereon from the date of payment at a rate equal to Eight percent (8%) per annum or the highest amount permitted by law, whichever is less. If Landlord shall fail to perform any of its obligations hereunder, Tenant may without notice perform such obligations. If Tenant incurs any costs in connection therewith, they shall be paid by Landlord to Tenant upon demand in cash, with interest thereon from date of payment at a rate equal to Eight percent (8%) per annum or the highest amount permitted by law, whichever is less. In the event that Landlord fails to pay Tenant, Tenant shall have the right to abate all Rent by the same amount, including any and all accumulated interest.

## ARTICLE 11

### Access to Premises

11.1 *Access to Premises.* Landlord shall have the right to enter upon the Premises at all reasonable business hours for the purpose of inspecting them, preventing waste, loss or destruction, enforcing any of its rights or powers under this Lease, or making such repairs or alterations as it is obligated to make under the terms of this Lease or which Landlord may elect to perform, following Tenant's failure to do so. Landlord shall be neither liable nor responsible for any loss to Tenant or Tenant's business, which may occur by reason of such entry.

Throughout the Term, Landlord shall have the right to enter the Premises at reasonable hours on reasonable notice for the purpose of showing them to prospective purchasers or mortgagees and, during the last six months of the Term or any Renewal Term, to prospective tenants.

If Tenant is not present to open and permit an entry into the Premises, Landlord or Landlord's agents may enter the same whenever such entry may be reasonably necessary or permissible by master key (or in emergencies forcibly). In no event shall the obligations of Tenant hereunder be affected by any such entry. **Due to a singular Fire Department Master Key being used for the entire West Outlot building, the Tenant cannot rekey the Premises without Landlord approval.**

## ARTICLE 12

### Miscellaneous

12.1 *Notices.*

All notices, bills or statements required hereunder shall be in writing and shall be deemed to have been given if either delivered personally or mailed by certified or registered mail, return receipt requested, or by facsimile, to the parties at their addresses as set forth below. If mailed, notice shall be deemed given on the date of the first attempted delivery. If delivered via facsimile, notice shall be deemed given on the date of the facsimile confirmation. The addresses and/or facsimile numbers specified for notices herein may from time to time be changed by the written notice of one party to the other.

        Landlord:    Lansing Township Downtown Development Authority
                       ATTN: Executive Director, 3209 W. Michigan Avenue, Lansing, MI 48917
                       Facsimile: (517) 485-3276
                       E-mail: shayward@lansingtownship.org

        Tenant:     Maggie Sanders
                       President
                       Address: 2420 Lyman Drive, Lansing, MI 48912
                       Mimi's Sweet Shop, Inc.
                       E-Mail: mimissweetshopinc@gmail.com

12.2 *Effect of Submission.* The submission by Tenant of this Lease for execution by Landlord shall confer no rights nor impose any obligations, including brokerage obligations, on any party unless both Landlord and Tenant shall have executed this Lease and duplicate originals thereof shall have been delivered to the respective parties. If Landlord executes this Lease and submits it to Tenant, such submission shall constitute an offer to Lease, which shall be irrevocable for 30 days.

12.3 *Litigation.* Landlord and Tenant do hereby waive trial by jury in any action, proceeding or counterclaim brought by either against the other upon any matters whatsoever arising out of or in any way

connected with this Lease, Tenant's use or occupancy of the Premises, or any claim or injury or damage or both.

12.4 *Governing Law; Invalidation.* This Lease shall be governed by and construed in accordance with the laws of the State of Michigan that are applied to leases made and to be performed in that state. The invalidation of one or more terms of this Lease shall not affect the validity of the remaining terms.

12.5 *Headings.* The headings contained herein are for convenience only and shall not be used to define, explain, modify or aid in the interpretation or construction of the contents hereof.

12.6 *Amendment.* This Lease represents the entire agreement between the parties. No oral or written, prior or contemporaneous agreements shall have any force or effect, and this Lease may not be amended, altered or modified unless done so by means of a written instrument signed by both parties. Landlord and Tenant represent that there are no oral agreements affecting this Lease, exhibits and rider, if any, attached hereto and forming a part hereof, supersede and cancel any and all previous negotiations, arrangements, letters of intent, lease proposals, brochures, agreements, representations, promises, warranties and understandings between the parties as stated by, including but not limited to, Tenant's or Landlord's agent(s), employee(s), or development agent(s). No alteration, amendment, change or addition to this Lease shall be binding upon either party unless reduced to writing and signed by each party.

12.7 *Subordination; Attornment; Estoppel Certificate.*

(a) This Lease shall, at the sole option of Landlord or its lenders, be subject and subordinate to the interest of the holders of any notes secured by mortgages on the Project, Structure or the Premises, now or in the future, and to all ground or underlying leases and/or any other documents of record and to all renewals, amendments, modifications, consolidations, replacements and extensions thereof. While the provisions of this Section are self-executing, Tenant shall execute such documents as may be desired by Landlord or any mortgagee to affirm or give notice of such subordination. In turn for such execution of documents, Tenant shall be entitled to receive the customary nondisturbance agreement from each such lender whereby the lender agrees to recognize Tenant's rights under this Lease following foreclosure so long as Tenant is not in default hereunder.

(b) Upon request of the holder of any note secured by a mortgage on the Project, Structure or the Premises, Tenant shall agree in writing that no action taken by such holder to enforce said mortgage shall terminate this Lease or invalidate or constitute a breach of any of its provisions, and Tenant shall attorn to such mortgagee, or to any purchaser of the Project, Structure or the Premises at any foreclosure sale, or sale in lieu of foreclosure, for the balance of the Term on all the terms and conditions herein contained. While the provisions of this Section are self-executing, all persons affected thereby shall execute such documents necessary to affirm or give notice of such attornment.

(c) At the request of Landlord, Tenant shall within ten (10) days deliver to Landlord, or anyone designated by Landlord, a certificate stating and certifying as of its date (i) the date to which Rent and other charges under this Lease have been paid; (ii) whether or not there are then existing any setoffs or defenses against the enforcement of any of the agreements, terms, covenants or conditions hereof on the part of Tenant to be performed or complied with (and, if so, specifying the same); (iii) if such be true, that this Lease is unmodified and in full force and effect and that Landlord is not in default under any provision of this Lease (or if modified, setting forth all modifications, and if Landlord is in default, setting forth the exact nature of such default); and (iv) such other information as Landlord may reasonably request in connection with the Landlord-Tenant relationship established by this Lease. Tenant acknowledges that any statement delivered pursuant to this subsection 12.7(c) may be relied upon by any purchaser or owner of the Project, Structure or Premises or Landlord's interest in the Project, Structure or Premises, or by any holder of a mortgage, or by an assignee of any mortgagee under any mortgage, or by anyone else to whom Landlord delivers it.

(d) Landlord, within ten (10) days of Tenant's request, shall deliver to Tenant an executed, written, Estoppel Certificate (Exhibit F) identifying Tenant and this Lease and certifying and confirming, in addition to any information or confirmation Tenant may reasonably require, if accurate, the following:

(i) That this Lease is either unmodified since its execution and in full force and effect, or modified since its execution but still in full force and effect as modified;

(ii) That Tenant is not in default of any of its obligations under this Lease;

(iii) The Lease Term, Rent Commencement Date, Expiration Date, Current Rent, Renewal Periods remaining as to the Leased Premises for which the Estoppel Certificate applies.

In the event Landlord shall fail to return such statement within ten (10) days of Tenant's request, Tenant shall presume that there are no defaults, monetary or non-monetary, under the lease and Landlord shall be estopped from rebutting such presumption.  Tenant may rely on such Certificate as true and correct.  The information contained within the Estoppel Certificate shall be binding upon the Landlord, its assignees and successors in interest.

12.8 *Third Parties.* Landlord and Tenant acknowledge, and warrant and represent to each other, that there are no third-party beneficiaries to this Lease.

12.9 *Light or Air Rights.* No rights to light or air over any property, whether belonging to Landlord or any other person, are granted to Tenant under this Lease.

12.10 *Successors and Assigns.* The covenants, conditions, and agreements contained in this Lease shall bind and inure to the benefit of Landlord and Tenant and, except to the extent prohibited by Section 10.4 above, their respective successors and permitted assigns.

12.11 *Sale or Transfer of Project or Premises.* Upon any sale or transfer, including any transfer by operation of law, of the Project, Structure or the Premises, Landlord shall be relieved of all subsequent obligations and liabilities under this Lease.  Any sale of the Premises, except to Tenant, shall be expressly subject to this Lease and any renewals or extensions hereof.

12.12 *Limitation on Liability.* Tenant agrees that the sole extent of Landlord's liability is his interest in the buildings.

12.13 *Accord and Satisfaction.* No payment by Tenant or receipt by Landlord of a lesser amount than the monthly Rent herein stipulated shall be deemed to be other than on account of the earliest stipulated Rent, nor shall any endorsement or statement on any check or any letter accompanying any check or payment as Rent be deemed in accord and satisfaction, and Landlord shall accept such check or payment without prejudice to Landlord's right to recover the balance of such Rent or to pursue any other remedy in this Lease as provided.

12.14 *Brokers and Consultants; Fees and Commissions.* Landlord and Tenant represent and warrant that there are no commissions due on this Lease.

12.15 *Liability Joint and Several.* If Tenant or Landlord is more than one person, each of their obligations under this Lease shall be joint and several.

12.16 *Triple Net Lease.* It is the intention of the parties that this Lease shall be what is commonly known as a "Triple Net" Lease and Tenant's obligations shall be those it has undertaken herein.

12.17 *Recording.* Tenant shall not record this Lease, or any memorandum of this Lease unless required under Michigan law.

12.18 *Independent Review*. Landlord acknowledges that it has had sufficient time and opportunity to review this Lease and its addendums, that Tenant and/or their respective representatives have not provided any type of legal and/or accounting advice, or made any other type of promise or representation not contained in writing herein.

12.19 *Covenants and Conditions*. All covenants and conditions contained in this Lease are independent of one another. All of the covenants of Tenant and Landlord contained herein shall be construed as both covenants and conditions.

12.20 *Radon Gas*.

**NOTICE TO TENANT**: Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed Federal and State guidelines have been found in buildings in Michigan. Additional information regarding radon and radon testing may be obtained from your County Public Health unit.

12.21 *Consent*. Notwithstanding anything in this Lease to the contrary, if at any time under the provisions of this Lease the consent or approval of Landlord or Tenant (or both) is required, it shall not be unreasonably withheld, delayed or conditioned (unless another standard is expressly stated).

12.22 *Force Majeure*. Any prevention, delay or stoppage due to strikes, lockouts, labor disputes, acts of God, inability to obtain labor or materials or reasonable substitutes, governmental actions, civil commotions, fire or other casualty, and other non-financial causes beyond the reasonable control of the party obligated to perform, shall excuse the performance of such party for a period equal to any such prevention, delay or stoppage, except the obligations, once accrued, imposed with regard to rental and other charges to be paid by Tenant pursuant to this Lease. Tenant must provide notice of any force majeure delay to Landlord within ten (10) days of the occurrence of such delay or Tenant waives its right to claim a force majeure delay. In addition, delays caused by governmental authorities in obtaining Tenant's permits shall not be deemed to be a force majeure event and shall not postpone the Rent Commencement Date.

12.23 *Financial Statements and Credit Reporting*.

(a) At any time while this Lease is in effect, but not more than twice in any Lease Year, Tenant shall, upon ten (10) days' prior written notice from Landlord, provide Landlord, any proposed purchaser in connection with a proposed sale of the Project, or any institutional lender with whom Landlord is negotiating for interim, construction or permanent financing during the Term or any Renewal Term, with a confidential current financial statement and financial statements for each of the two (2) years before the then-current fiscal statement year. Such current statement shall be prepared in accordance with generally-accepted accounting principles and, if such is the normal practice of Tenant, shall be audited by an independent certified public accountant. All information received by Landlord shall be treated in a confidential manner; provided, however, Tenant expressly agrees that Landlord may use such financial information for the purposes outlined above and may disclose the same if required by law.

(b) Landlord shall have the right at any time and from time to time to obtain a credit report on Tenant. Tenant shall execute any form reasonably required by Landlord or the credit-reporting entity to enable Landlord to obtain a credit report. Tenant shall grant any consent required by any credit-reporting agency if necessary or desirable to enable Landlord to obtain a credit report.

12.24 Electronic Signatures, *Counterparts and Facsimile*. This Lease may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties by facsimile. The parties agree that signatures on this Lease, as well as any other documents to be executed under this Lease, may be delivered by facsimile in lieu of an original signature, and the parties

agree to treat electronic signatures of any kind intended as signatures as original signatures and agree to be bound by this provision.

12.25 *Venue.* The parties agree that any action shall be brought in the court of appropriate jurisdiction in Ingham County, Michigan or U.S. District Court for the Western District. The parties consent to jurisdiction and waive all claims of improper venue and *forum non-conveniens.*

12.26 *Right to Lease.* Except as otherwise set forth in this Lease, Landlord reserves the absolute right to effect such other tenancies in the Structure and Project as Landlord in the exercise of its sole business judgment shall determine to best promote the interests of the Project or any of the interest of Landlord in the Project. Tenant does not rely on the fact, nor does Landlord represent, that any specific lessee or mix, type or number of lesseess shall, during the Term or any Renewal Term, occupy any space in the Project.

12.27 *Warranty of Authority.* If Tenant is a corporation or partnership, each individual executing this Lease on behalf of the corporation or partnership represents and warrants that he is duly authorized to execute and deliver this Lease on behalf of the corporation or partnership and that this Lease is binding upon the corporation or partnership. If Tenant is a corporation, the persons executing this Lease on behalf of Tenant hereby covenant and warrant that: (a) Tenant is a duly qualified corporation and all steps have been taken before the date of this Lease to qualify Tenant to do business in the State of Michigan; (b) all franchise and corporate taxes have been paid to date; and (c) all forms, reports, fees and other documents necessary to comply with applicable laws will be filed when due.

12.28 *Employee Parking.* As a written condition of employment, Tenant shall require all employees of Tenant who commute to their employment via vehicle, motorcycle, bicycle or other non-public modes of transportation to park in the vertical parking structure located to the northeast of the Leased Premises during their hours of employment. The right of Tenant's employees to park in the vertical parking structure shall be in accordance with, and subject to, applicable law and all rules and regulations now or in the future in effect which concern the vertical parking structure. If any of Tenant's employees violate this requirement, which violation shall include, without limitation, parking in any of the surface parking lots located adjacent to or in close proximity to the Leased Premises during the hours of their employment, such violation shall result in a $25.00 fee per violation, per violating employee, charged to Tenant as additional rent. Landlord shall invoice Tenant for any such fees on a monthly basis and shall provide Tenant with reasonable documentation establishing the validity of the fees for which Tenant is being invoiced. This fee shall paid by Tenant to Landlord at Tenant's next scheduled installment payment of rent due under this Lease or within fifteen (15) days after Tenant's receipt of the invoice documenting the amount due, whichever is first to occur.

12.29 *Survivorship.* Landlord is the current sub-tenant under a certain Ground Lease between the Charter Township of Lansing and Eastwood, LLC, which Ground Lease concerns the Leased Premises. If Landlord defaults under the terms of the Ground Lease, ceases to be a going concern, or if any other event or occurrence causes Eastwood, LLC to assume Landlord's rights under this Lease, from and after the date Tenant is notified by Landlord of such event or occurrence, Tenant shall fully and faithfully perform its duties and obligations under this Lease to Eastwood, LLC and, provided Tenant is not in default under the terms of this Lease, beyond any applicable cure period, Tenant shall continue to have all of Tenant's rights under this Lease including, without limitation, the right to possess and occupy the Leased Premises.

12.30 *Contingencies.* This Lease is contingent on the Tenant receiving an acceptable SBA loan or other source of financing by not later than July 31st, 2016; should Tenant fail to do so, Landord or Tenant may cancel this Lease with no liability to either party.

SIGNATURE PAGE TO FOLLOW.

IN WITNESS WHEREOF, this Lease has been executed as of the day and year first above written.

LANDLORD:

Lansing Township Downtown Development Authority,
a Michigan downtown development authority.

WITNESSES:

By: _____
Steven L. Hayward, Executive Director

TENANT:
Mimi's Sweet Shop, Inc.
a MichiganCorporation.

By: _____
President, Manager Margaret M. Sanders

Exhibit A – Description of Premises & Option Space
Exhibit B – Property
Exhibit E – Exhibit F – Estoppels Certificate
Exhibit G – Monthly Payment Worksheet
Exhibit H – End of Year Reconciliation Worksheet

Exhibit A – Description of Premises



Exhibit B – Property

To be determined by Tenant Architect

Exhibit E – Estoppel Certificate

The undersigned represents that he is the Landlord, or the legal representative of the landlord, of the premises located at
_____. The undersigned further represents that the following is a true
and accurate statement of rent due, related charges, security deposit and last month's rent held by the landlord for the
above-mentioned premises.

The fixed or minimum monthly rental presently payable under the terms of the Lease is $_____ per month and has
been paid through _____, _____.

All rent, escalation rent, charges for taxes, maintenance and common areas, cost of living increases payable under the
terms of the Lease has been paid through _____, _____ and the Lessee is not presently in default of any of the
terms or conditions of the Lease.

All other additional rent, if any, payable under the terms of the Lease has been paid through _____, 20___.

As of this date, _____, Lease arrears are as follows:

| Type | Amount Due | As Of |
|---|---|---|
| Rent | | |
| Taxes thru | _____ | _____ |
| Common Area | _____ | _____ |
| Assessments | _____ | _____ |
| Insurance | _____ | _____ |
| Advertising | _____ | _____ |
| Other | _____ | _____ |
| | | |
| TOTAL | _____ | _____ |

The amount of the security deposit under the Lease is $_____.

Other then as stated above, there are no monies owed under the Lease for the premises between
_____ and _____
dated _____ nor are there any defaults of the Lease by the tenant as of such date.

The expiration date of the term of said Lease is _____. The Master Lease provides for _____
renewal terms. In the event the Master Lease provides for renewal options, notification of renewal or non-renewal must
be sent to the Landlord no later than:
(Dates of Notification) _____

The Master Lease has been modified, supplemented, or amended _____ time(s). (Copies of the documents must be
attached hereto)

The following applies to the aforementioned Master Lease (check one):

_____ The undersigned is the owner, or agent of the owner of the premises, and no other Master Lease exists, or;

_____ Another Master Lease/Ground Lease for the premises exists between the undersigned and _____

_____ dated _____, a copy of which is attached.

The undersigned Landlord/representative of the Landlord hereby acknowledges that the Master Lease and any
Amendments to it remain unchanged and in full force and effect. The Landlord understands that pursuant to the terms of
the Master Lease that all changes must be agreed to by the parties to that document in writing.

LANDLORD: _____ (Please Print)

ADDRESS: _____ PHONE: _____

CITY: _____ STATE: _____ ZIP: _____

LANDLORD'S SIGNATURE: _____ DATE: _____

## NOTARIZATION FOR AN INDIVIDUAL

STATE OF          )
              )ss:
COUNTY OF      )

On this _____ day of _____, 20____ before me appeared _____ to me known to be the person described in and who executed the foregoing instrument, and acknowledged that he executed the same as his free act and deed.

_____
Notary Public

My Commission Expires:

## NOTARIZATION FOR A CORPORATION

STATE OF          )
              )ss:
COUNTY OF      )

On this _____ day of _____, 20___ before me personally came _____, to me known, who, by me duly sworn, did depose and say that deponent resides at _____ that deponent is the _____ of, the corporation described in, and which executed the foregoing Agreement, that deponent knows the seal of the corporation, that the seal affixed to the agreement is the corporate seal, that it was affixed by order of the Board of Directors of the corporation; and the deponent signed deponent's name by like order.

_____

  Notary Public

  My Commission Expires:

## NOTARIZATION FOR A PARTNERSHIP

STATE OF          )
              )ss:
COUNTY OF      )

On this _____ day of _____, 20_____ before me, the undersigned, a Notary Public in and for said County and State, personally appeared _____ known to me to be the person who executed the within instrument as a Partner of _____, partnership, and acknowledged to me that the partnership executed the same.

_____
Notary Public

My Commission Expires:

Exhibit "F" - Menu

Exhibit "G"

# Mimi's Sweet Shop __Monthly__ Lease Payment Methodology

| | | |
|---|---|---|
| Base Rate Charge: | $ | 20.00 per square foot |
| Lease Area: | | 3,000 square feet |
| Minimum Monthly payment [(Base Rate * Lease Area) / 12 months] due on the 1st: | $ | 5,000.00 |

## Gross Sales

| | |
|---|---|
| Week 1 Sales: | |
| Week 2 Sales: | |
| Week 3 Sales: | |
| Week 4 Sales: | |
| Week 5 Sales: | |
| Week 6 Sales: | |

Actual Monthly Sales: _____   x 12 =   **Estimated Annual Gross Sales** _____

### Additional Rent Schedule

| Annual Gross Sales | Percentage |
|---|---|
| Less than $800,000 | Base Rate Only |
| $800,001 - $925,000 | 8% |
| $925,001 - $1,050,000 | 9% |
| $1,050,001 - $1,200,000 | 10% |
| $1,200,001 - $1,350,000 | 11% |
| $1,350,001 or Greater | No Charge |

## Monthly Lease Payment

| $104,167 or Actual Monthly Sales from Above, whichever is less. | Percentage | Gross Monthly Amount |
|---|---|---|
| _____ x | | _____ |
| Less $5,000 received on the 1st: | | $ (5,000.00) |
| Additional Rent due by the 15th: | | _____ |

Form Completed by:

| | |
|---|---|
| Name: | _____ |
| Title: | _____ |
| Signature: | _____ |
| Date: | _____ |

**Note:** Per the Lease all $ amounts increase at 2% per annum, contact the Landlord annually for an updated Exhibit G & H.

Exhibit "H"

# Mimi's Sweet Shop End of Year Reconciliation Worksheet

Base Rate Charge:  $      20.00  per square foot
Lease Area:          3,000  square feet
Minimum Monthly payment [(Base Rate * Lease Area) / 12 months]:   $         **5,000.00**

| Month | Gross Sales | Payments |
|---|---|---|
| First | | |
| Second | | |
| Third | | |
| Forth | | |
| Fifth | | |
| Sixth | | |
| Seventh | | |
| Eighth | | |
| Ninth | | |
| Tenth | | |
| Eleventh | | |
| Twelfth | | |

**Actual Annual Totals:** [          ]

### Additional Rent Schedule

| Annual Gross Sales | Percentage |
|---|---|
| Less than $800,000 | Base Rate Only |
| $800,001 - $925,000 | 8% |
| $925,001 - $1,050,000 | 9% |
| $1,050,001 - $1,200,000 | 10% |
| $1,200,000 - $1,350,000 | 11% |
| $1,350,001 or Greater | No Additional Charge |

## Annual True-up

| Actual Annual Sales or $1,350,000 maximum. | | Actual Percentage | Amount Due/Owed by 15th of month with 12th monthly payment |
|---|---|---|---|
| [          ] | x | [          ] | [          ] |

Form Completed by:

Name: _____
Title: _____
Signature: _____
Date: _____

**Note:** Per the Lease all $ amounts increase at 2% per annum, contact the Landlord annually for an updated Exhibit G & H.